FEB 0 6 2020

JUDGE GARDEPHE

1 | John De'Bey
74 W 92ND ST #17D
2 | NEW YORK, NY 10025
(480)-534-0834
3 | Email: JOHNDEBEY@AOL.COM

**MAG. JUDGE CAVE**

4

5 | ## UNITED STATES DISTRICT COURT

6 | ## FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| JOHN DE'BEY | Case No.: |
| Plaintiff, | CIVIL RIGHTS COMPLAINT: |
| vs. | **42 U.S.C. § 1983, § 1985 (2) & (3) : FIRST, FOURTH, FIFTH, SIXTH, NINTH, TENTH AND FOURTEENTH AMENDMENTS;** |
| THE CITY OF NEW YORK, | |
| COUNTY OF NEW YORK | **28 U.S.C. § 1331, 28 U.S.C. § 1367,** |
| ADMINISTRATION FOR CHILDREN'S SERVICES, | |
| FAMILY COURT OF MANHATTAN | **2 0 CV 1034** |
| MUBANGA NSOFU, Individual Capacity | |
| MARSHA WEAKS, Individual Capacity | |
| THE NEW YORK FOUNDLING, | |
| CAITLYN HALL, Individual Capacity | |
| DISTRICT ATTORNEY OF MANHATTAN | |
| SARA ROLLER WEISS Official Capacity | |
| STEPHANIE EIEL, Individual Capacity | |
| OFFICER CASTELLANOS, Individual Capacity | |
| ELSA GASTON | |
| NEW YORK CITY POLICE DEPARTMENT | |
| DEPARTMENT OF CORRECTIONS, | |
| NYC HOUSING AUTHORITY, | |
| WISE TOWERS | |
| NYC HEALTH + HOSPITALS/METROPOLITAN | |
| Defendant(s). | |

TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York

## I.  PRELIMINARY STATEMENT

1.) This is a civil rights action in which plaintiff seeks relief for the violation of his
rights secured by 42 USC §1983, §1985 §1988, the First, Fourth, Fifth, Sixth, Ninth, and Fourteenth
Amendments to the United States Constitution.

2.) The claims arise from a February 13th & 27th, 2019 and Jan of 2020 incidents in which
    Officers of the New York City Police Department ("NYPD") and Agents of the
    Administration for Children's Services ("ACS"), acting under color of state law,
    intentionally and willfully subjected plaintiff to, inter alia, a seizure and deprivation of his
    children, false arrest, false imprisonment and false confession.

3.) Plaintiff seeks monetary damages (actual, general, special, compensatory, and punitive)
    against defendants, as well as an award of costs and attorneys' fees, and such other and
    further relief as the Court deems just and proper.

4.) Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and
    questions of federal constitutional law. Jurisdiction also exists under the Declaratory
    Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiffs'
    state law claims is pursuant to 28 U.S.C. §1367. 2. Venue is proper in the Southern District
    of New York in that the events and conduct complained of herein all occurred in the
    Southern District of New York.

## II.  JURISDICTION AND VENUE

5.) Jurisdiction exists pursuant to 28 U.S.C. § 1331 and 1343 based on 42 U.S.C. §1983 and
    questions of federal constitutional law. Jurisdiction also exists under the Declaratory
    Judgment Act, 28 U.S.C. §§ 2201(a) and 2202. Supplemental jurisdiction over Plaintiffs'
    state law claims is pursuant to 28 U.S.C. §1367. 2. The amount in controversy exceeds
    $75,000: excluding interest and costs. Venue is proper in the Southern District of New York
    in that the events and conduct complained of herein all occurred in the Southern District of
    New York.

### III.PARTIES

6.) At all times relevant hereto, Plaintiff John De'Bey was a Citizen of New York State and the United States of America.

7.) Defendant City & County of New York, hereinafter "Defendant City" is a New York municipal corporation and is the legal entity responsible for itself and all ministerial and non-ministerial acts for the Administration for Children's Services AKA Child Protective Services, Family Court of Manhattan, Department of Corrections, Manhattan District Attorney, New York City Police Department, NYC Health + Hospitals/Metropolitan. This Defendant is also the employer of the individual Defendants and is a proper entity to be sued under 42 U.S.C. § 1983 & § 1985. Administration for Children's Services is further sued under supplemental jurisdiction for violations of Family Court Act - FCT § 1036. Service of summons (b), (c) & (d).

8.) Defendant City and it's creatures are properly sued directly under 42 U.S.C. § 1983 for its own delegated deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification, acquiescence and intentional failures which were moving forces in the complained of constitutional and statutory violations and resulting injuries.

9.) The Defendant City is also properly sued under 42 U.S.C. § 1983 for the challenged delegated final decisions of Defendants Nsofu, Weaks, and Castellanos as employees of the City agencies, and for those of any final delegated decision makers, with respect to the hereinafter challenged deliberately indifferent policies, decisions, widespread habits, customs, usages and practices while performing ministerial and non-ministerial acts.

10.)    Defendant THE NEW YORK FOUNDLING is properly sued directly under 42 U.S.C. § 1983 operating under color of law for the purpose of carrying out delegated and ministerial and non-ministerial acts on behalf of ADMINISTRATION FOR CHILDRENS SERVICES and for its own delegated deliberately indifferent unconstitutional decisions, policies, practice, habits, customs, usages, training and derelict supervision, ratification,

acquiescence and intentional failures which were moving forces in the complained of constitutional and statutory violations and resulting injuries.

11.)    At all times relevant hereto, Defendant Mubanga Nsofu was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as an ACS agent employed by the Defendant City and/or of the Administration for Children's Services. Defendant Nsofu is sued individually.

12.)    At all times relevant hereto, Defendant Marsha Weaks was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as an ACS agent employed by the Defendant City and/or of the Administration for Children's Services. Defendant Weaks is sued individually.

13.)    At all times relevant hereto, Defendant Stephanie Eiel was a citizen of the United States and a resident of the State of New York and was acting under color of state law in her capacity as an NYPD Detective employed by the New York City Police Department and Defendant City. Defendant Eiel is sued individually.

14.)    At all times relevant hereto, Defendant Castellanos was a citizen of the United States and a resident of the State of New York and was acting under color of state law in his capacity as an NYPD Police Officer employed by the New York City Police Department and Defendant City. Defendant Castellanos is sued individually.

15.)    At all times relevant hereto, Defendant Caitlyn Hall was a citizen of the United States and a resident of the State of New York. And was counsel for Plaintiff regarding the criminal matters disputed in this complaint. Defendant Hall is sued Individually pursuant to the 6th Amendment of the United States Constitution (Ineffective Counsel).

16.)    At all times relevant hereto, Defendant Sara Weiss was a citizen of the United States and a resident of the State of New York. Defendant Sara Weiss is sued in her official capacity for Injunctive Relief as the Assistant District Attorney for Manhattan County, employed by the Defendant City and/or County, and was acting under color of state law.

17.)     At all times relevant hereto, Defendant Elsa Gaston was a citizen of the United States and a resident of the State of New York and is sued personally. Defendant Elsa Gaston is properly sued under supplemental jurisdiction for Actual Malice under New York State Law.

18.)     As the ADA for the Manhattan District Attorney's office, Defendant Sara Weiss both exercised and delegated their municipal final decision-making power to the Manhattan Criminal Court and others.

## NOTICE OF CLAIM

19.)     Within 90 days of the incident, Plaintiff filed a written Notice of Claim with the New York City Office of the Comptroller, Claim#2019P1014747. Over 8 months have elapsed since the filing of that notice, and this matter has not been settled or otherwise disposed of.

## FACTUAL BACKGROUND

**ACS / CPS and POLICE BREAK INTO PLAINTIFFS HOME WITHOUT CONSENT, WITHOUT A WARRENT and WITHOUT FIRSTHAND KNOWLEDGE OF THE FACTS OR EXIGENT CIRCUMSTANCES.**
**(NSOFU, WEAKS, ACS, CASTELLANOS, GASTON)**

1.) At all times material defendants ACS, NSOFU, WEAKS and CASTELLANOS was under the direct supervision, authority, employ and control of Defendants, NEW YORK CITY POLICE DEPARTMENT, ADMINISTRATION FOR CHILDRENS SERVICES and THE CITY OF NEW YORK.

2.) On February 13th plaintiffs' Children along with their Mother went to visit their grandmother in Queens NY.

3.) Upon information and belief that morning around 10:30 am the mother got into an argument with a purported groundskeeper named David who was responsible for the upkeep of rental units in that area which included the home of the grandmother of the Children.

4.) After the verbal argument later that day the mother received a knock on the door from a man who identified himself as Mr. Conrad Conway and his unnamed partner of CPS and it was regarding a report from the groundskeeper David that the Plaintiffs son was outside without supervision that day.

5.) The mother denied Mr. Conrad entry into the home.

6.) Mr. Conrad then called the New York City Police Department to assist with a warrantless search.

7.) When the 8 police officers arrived the mother, Sylfronia King who also goes by the title Mother Queen Mut II told officers that they could not enter.

8.) Officers spoke to the mother outside and cornered her while the other officers made their way into the home without consent or a warrant.

9.) The officers proceeded into the home to locate the Children and found the two in the backroom one 8 months called by the name ~~████████~~ *A.A* located in a pack in play unit and another in the same room 2 years old and called by the name ~~████████~~ *K.A*

TITLE **42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

10.)    The officer who made the search was a supervising officer Rodriguez who reported that she examined the children for marks, bruises and scratches according to CPS records. Rodrigues goes on to state that both Children appeared healthy and unharmed. There were no reports of suspected abuse, and only an unproven allegation that the Plaintiffs Son was seen outside without supervision from a disgruntled groundskeeper who wished to remain anonymous.

11.)    After the Children were inspected, Mr. Conrad informed the mother that the home did not have working water or gas and because the unit used space heaters as a means of heat that the Children could not stay in the unit.

12.)    Mr. Conway asked if the Children had anywhere else to go.

13.)    The grandmother informed CPS that they did not live there and were only visiting. The Grandmother gave Mr. Conrad the Plaintiffs number.

14.)    Plaintiff received a phone call at about 6 PM from Mr. Conrad asking if he was the father of the Children and the plaintiff responded: Yes. Mr. Conrad then told Plaintiff of the events that had taken place and that both the Children couldn't stay at their grandmothers until the Gas and water were restored.

15.)    Mr. Conrad also claimed that the mother would not co-operate with them and asked plaintiff if he'd ask the mother to bring the Children home, otherwise they'd take them from the plaintiff and mother.

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

16.)    Plaintiff asked Mr. Conrad to put him on the phone with the Mother. When plaintiff

spoke to the mother, he asked her to cooperate for the children's sake.

17.)    It was not consensual for Plaintiff to comply; defendants had the Plaintiffs Children

in their custody and that was enough for plaintiff to cooperate.

18.)    Mr. Conrad informed the plaintiff that he'd be bringing the mother and Children

home in his CPS van to their apartment on the Upper West Side of Manhattan.

19.)    When Mr. Conrad reached the Plaintiffs home, he called plaintiff on his cell phone

and requested him to come downstairs to open the door. Mr. Conrad reminded the plaintiff

that he would have to inspect the home, examine the Children a second time, although they

were previously cleared by NYPD back in Queens for bruises, cuts, scratches, etc.  Mr.

Conrad cleared the Children of any harm, cleared the home as Children had proper clothes,

coats for the weather, pajamas, food, heat, gas, running hot and cold water. Plaintiff even

informed Mr. Conrad that he and his family were vegans.

20.)    Mr. Conrad and his partner left the Children with both the plaintiff and their mother

and informed plaintiff that someone would follow up from his agency.

21.)    On or about Feb 16 2019 plaintiff received a follow up call from ACS and it was

regarding the recent incident, however the rep on the phone asked to call the plaintiff back,

but plaintiff never heard back from ACS thereafter.

22.)    On or about the morning of February 20th, 2019 plaintiff and the children's mother had a disagreement.

23.)    The disagreement was not physical at any time and both plaintiff and the mother of the Children have no domestic violence or criminal history.

24.)    The mother and plaintiff were living in the same apartment but temporarily separated.

25.)    For about a year the mother lived in the back room and the plaintiff stayed in the living room on the sofa.

26.)    Plaintiff did not see his daughter often as he worked around the clock and only came home to sleep or continue working remotely.

27.)    As a result of the argument plaintiff left his home to work on his business and stayed away for seven days.

28.)    On February 26th at about 11pm Plaintiff received a phone call from an ACS supervisor informing Plaintiff that ACS agents were at his door.

29.)    The supervisor did not inform plaintiff of the allegations made against the mother that had taken place earlier that afternoon.

30.)    Plaintiff later learned that a neighbor "Elsa Gaston" had allegedly called the ACS hotline number after the mother told her she needed help with the Plaintiffs son Kofi.

31.)    The plaintiff although not having any personal history with Ms. Gaston had already known that Gaston was jealous of his family especially as to the mother via gossip that had gotten around the building.

32.)    The mother was having a mental breakdown and so she asked Ms. Gaston to watch our Son for a few hours and so Defendant Gaston took him, and the mother picked him up later that afternoon.

33.)    Defendant Gaston also made remarks that plaintiffs daughter appeared to be underweight for her age and she was able to weight her because she snatched the Plaintiffs daughter out of the hands of the Mother without consent on the elevator of the Plaintiffs residence.

34.)    At about 2:00 am in the morning Plaintiff received a follow up phone call from the ACS supervisor and gave Plaintiff a number for one of the agents on the scene.

35.)    Plaintiff is unsure if the agent that responded to the call was Defendant Weaks or Defendant Nsofu. The agent promptly handed the phone to a male who identified himself as officer Castellanos, who was contacted by ACS to open the Plaintiffs door in the early hours of the morning to assist in their investigation.

36.)    Officer Castellanos asked plaintiff of his whereabouts and plaintiff responded that he was away on business and staying at a hotel.

37.)    Plaintiff asked whether they had a warrant to enter his home but did not receive an answer.

38.)    Officer Castellanos said they were going to "break the door down" and so the plaintiff agreed to speak to the mother over the phone to avoid unnecessary lethal force against the Mother.

39.)    Plaintiff was placed on speaker phone and plead to the mother that if she didn't open the door, he feared that they'd violate the law and break the door down without a Warrant and possibly hurt her or worst.

40.)    Officer Castellanos and the ACS agents finally got into the apartment after 30 mins of banging and "kicking in the door", making threats to a frightened and scared mother who was having a mental breakdown and postpartum.

41.)    According to CPS records, it was only when the officers and agents entered the home that they had learned of the Plaintiffs daughters' medical condition of severe malnourishment.

42.)    Officer Castellanos and his accompanied officers were not eyewitnesses on Feb 26th at around 2pm, as the police arrived at 2am the next morning on Feb 27th and where not initially called by Ms. Gaston (neighbor) who instead called CPSs hotline number.

43.)    Upon information and belief when calling CPS and other agencies who deal with public safety the pre-recording on the phone prompts reporters to hang up and dial 911 if it's an emergency.

44.)    No emergencies were reported to the police by Defendant Gaston (Alleged witness).

45.)    Police or Ambulance were not called at the time the incident was first reported to CPS.

46.)    It was only when Defendant Nsofu couldn't get through with her investigation that she used police powers to get the door opened without firsthand knowledge of the facts and only acting from a tip from a neighbor.

47.)    Upon information and belief Defendant Gaston is a known liar, instigator and troublemaker in Plaintiffs building. Plaintiff only knows of Defendant Gaston by way of passing by in the hallways of the building and out-front in the side park of our building. Defendant Gaston holds herself out as calling us Family when we depart from our building daily.

48.)    Plaintiffs Family is reserved and does not socialize with the people in their building.

49.)    Defendant Gaston told ACS that my Son was abandoned by his mother, meanwhile Plaintiffs son was discovered by police with his Mother at the time of her arrest. According to police records Plaintiffs' son was not reported as malnourished or abused

1

2    50.)       It took ACS over 7 hours to finally call the police and only claimed that there was an

3    emergency after breaking into the home. Within those 7 hours on a weekday Defendant

4    Nsofu could have gotten an emergency warrant to open the door without violating federal

5    law and the constitution.

6

7

8    51.)       It is a fact that Defendant Nsofu does not have a duty of care until children are

9    actually in custody. This is due to the 14th amendment and the right to due process and

10   protection from State interference, which is the exact right Defendant Nsofu decided to tread

11   on.

12

13   52.)       On or about January 7th ACS met with Plaintiff and his Wife at The New York

14   Foundling while they were visiting their children.

15

16

17   53.)       ACS Confronted Plaintiff and his Wife about their Son who had recently been born

18   on November 11th 2019 and demanded his whereabouts.

19

20   54.)       Plaintiff told agents his Son was with his Mother and Sister in Queens and has been

21   there since his birth back in November of 2019 due to the open case.

22

23

24   55.)       That night/early morning around 3am ACS went to Plaintiffs Mothers home in the

25   middle of the night with Police assistance and no warrant to remove the child.

26

27   56.)       It is a fact that ACS has made a name for itself with this pattern evidence of abusive

28   tactics of sketchy removals without warrants. ACS/CPS has used police force 3 times as to

the Plaintiffs children. One agent told Plaintiffs Mother *"We don't need warrants"* while

removing his Son from her.

## DEFENDANT NSOFU COMMITS PERJURY IN FAMILY COURT BY WITHOLDING EXONERATING EVIDENCE.
### (NSOFU & POSSIBLE MUNICIPAL LIABILITY)

57.) At all times material defendant NSOFU was under the direct supervision, authority, employ and control of Defendants ADMINISTRATION OF CHILDRENS SERVICES and THE CITY OF NEW YORK / COUNTY OF MANHATTAN.

58.)    On February 27th Defendant Nsofu caused for an emergency removal request to be filed in MANHATTAN FAMILY COURT.

59.)    Defendant made several false accusations in her agency's petition to substantiate her claims made against plaintiff, including intentionally omitting information she knew would cause great affect to the outcome of both Ms. King and Plaintiffs cases in both criminal and family court.

60.)    Defendant Nsofu makes the reader of the petition suggest that February 27th was the first time her agency contacted Plaintiff and Ms. King.

61.)    Defendant Nsofu omitted the events that had taken place on February 13th in Arverne NY in the petition. This event is important as it proves that the Plaintiffs daughter was healthy just two weeks before his arrest.

62.)    Plaintiff was not home with his daughter from February 21st through February 27th. Plaintiff was away on business and left both children in the care of their Mother.

63.)    Plaintiff was arrested when he returned on the evening of the 27th of February.

64.)    The February 13th report further proves that both children were well taken care of at their 74 W 92nd street residence with suitable clothes, food, working utilities and a clean home.

65.)    In the Family Court petition Defendant Nsofu states that the Plaintiff was a PLR *"person legally responsible"* , This term was used to avoid identifying the Plaintiff as the Father of the children as the agency was to pretend that they had never met the plaintiff on February 13th. and that it did not know the Plaintiffs status to the children which is now false due to the CPS report discovery made in Family Court which shows the agency established Plaintiff as the Father on February13th 2019.

66.)    In the Family Court petition/ACS report Defendant Nsofu states that there was rotten milk found in Plaintiffs refrigerator on February 27th, 2019. However, defendant ADA Weiss provides a conflicting claim that Plaintiffs Family maintained a strict vegan diet.

67.)    In the Family Court petition Defendant Nsofu states that she received a letter from Queen Mut but did not say when she received such letter.

68.)    Defendant Nsofu received the letter on or about Feb 16th 2019 by certified mail.

69.)    The letter was sent as a follow up response to the February 13th event.

70.)    Plaintiff asserts that this information was suppressed in his criminal court case by his Attorney and the DA.

71.)    The DA claimed Plaintiff knew his daughter was under weight for months from late 2018 into 2019. If this evidence were present, then it would have been ruled an accident. So instead the evidence was suppressed, and Plaintiff was forced into a plea deal in an attempt to reunify with his children.

72.)    It is a fact that as a matter of municipal liability for the City that it should take caution on its position regarding the facts of this case,  Because if the Plaintiff is guilty of knowing his daughter was underweight for over 2 months as indicated in the Plea Bargaining Agreement, that would mean that Plaintiffs daughter was severely malnourished on February 13th 2019 when Plaintiffs Family were held in CPS/ ACS and Police custody for over 6 hours, making them directly liable as to the Plaintiffs daughter and can open up a separate litigation for breach of duty of care.

73.)    Upon information and belief when one leaves a child with someone responsible for that child and has reason to believe such child is safe, said person is not guilty of endangering the welfare of a child.

TITLE **42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

74.)      Upon information and belief Defendant Nsofu knowingly, willfully and maliciously lied against the plaintiff in a Family court and caused for police and other law enforcement agencies to rely on her falsified information.


### ACS, NSOFU, CASTELLANOS and ADA WEISS CLAIMED MOTHER AND PLAINTIFF WERE INSANE MERELY BECAUSE THEY HELD THE RELIGIOUS BELIEF THAT SHE WAS A KEMMETIC QUEEN AND WORSHIPPED THE SUN GOD RA.

75.) At all times material defendants ACS, NSOFU, CASTELLANOS and ADA WEISS were under the direct supervision, authority, employ and control of Defendants DISTRICT ATTORNEYS OFFICE OF MANHATTAN, NEW YORK CITY POLICE DEPARTMENT, ADMINISTRATION FOR CHILDRENS SERVICES and THE CITY OF NEW YORK / COUNTY OF MANHATTAN.

76.)      On February 13th 2019 Plaintiff had his first contact with CPS agent Mr. Conrad Conway now discovered to be Mr. Sigwright had expressed that the Mother was Afro-centric in his CPS report. Further the Mother "Sylfronia King" identified herself as Queen Mut II by religious means.

77.)      Mr. Sigwright further noted that the family were Vegans and had a refrigerator filled with foods.

78.)      Mr. Sigwright did not report the Mother/Father as "crazy" or "bizarre" because of their religious beliefs.

79.)    The mother Sylfronia King is also known as a "Queen Mother" and has full authority over her family.[1] & [2]

80.)    The family subscribe to the AKOM religion.

81.)    According to AKOM religion, the "spiritual selection" of a Queen is chosen by the God of the Akan, cosmology, lineage and heritage by an authority called, "The Abosom" through the power of RA and our star system according to Ancient AKAN text. Thus, the appointment of Queen Mut, called to lead her "people" of Akan heritage called the "Akanfo".[3]

82.)    On that night the children were left with their Mother and their Father.

83.)    On or about February 16th, 2019 Defendant Nsofu left a card on Plaintiffs door, when Plaintiff got home, he immediately replied Via email that he did not want her agencies services that she came to offer.

84.)    Defendant Nsofus email came back from NYC.GOVs server as a non-existing account which raised red flags as to whether she was a real agent.

[1] Farrar, Tarikhu (1997). "The Queenmother, Matriarchy, and the Question of Female Political Authority in Precolonial West African Monarchy". *Journal of Black Studies*. 27 (5): 579–597. https://journals.sagepub.com/doi/10.1177/002193479702700501
[2] The Power of a Queen Mother". *Queen Mothers*. Saint Michael's College. Retrieved 3 January 2016. http://academics.smcvt.edu/africanart2/kathleen/Power.htm
[3] Odwirafo Kwesi Ra Nehem Ptah Akhan (2017). "AKRADINBOSOM: Akan Abosom of the Okra/Okraa (Soul) and the 7-Day Akan Week" ...pg 21 (5) https://books.google.com/books?id=3gmYDgAAQBAJ&pg=PA21&lpg

TITLE **42 U.S.C. § 1983, & § 1985.** De'Bey V The City of New York

85.)      Plaintiff and his Wife sent Defendant Nsofu a physical piece of mail with the same message of a refusal of services and a decline to contract with the agency.

86.)      On or about February 26th 2019 when Plaintiff was away from home for about a week His Wife had a mental breakdown and Plaintiffs daughter had lost a significant amount of weight within a few days while he was away.

87.)      Two weeks prior on February 13th 2019 both children were reported as healthy by the NYPD, their supervisor and CPS agent Mr. Sigwright and John Doe. This information can be found in the ACS/CPS report.

88.)      As a result of Plaintiffs daughters rapid weight loss, Plaintiffs Wife Queen Mut II "mother" was arrested on February 27th in the early am.

89.)      Plaintiff was arrested later that evening after voluntarily deciding to go with authorities to the station in Harlem to learn more about his children's conditions.

90.)      Plaintiff was accused of knowing his daughter was under weight.

91.)      Plaintiff knew his daughter was not overweight and was petite, but most girls in his family were at her age and did not raise any alarms for the Plaintiff to seek medical attention.

92.)      Defendant Eiel played on the Plaintiffs West African background claiming that because the Plaintiff claimed ties to a tribe there by the name of the AKAN that it was the

- 18 -

ways of his people to "starve children", but never formerly accused Plaintiff of "starving his child".

93.)    It was the Plaintiffs intent to inform Defendant Eiel of the opposite, and that simply because you "see smaller people in [West Africa] on TV does not mean that they all live that way and die from starvation". Plaintiff further stated that most of them grow up just fine.

94.)    On or about March 1st 2019 Plaintiff met with Defendant Weiss and although Plaintiff asked for an attorney before being arrested the ADA decided to still ask Plaintiff questions about the claims and further asked about the Mother Queen Mut II, even though they were not charged as co-defendants.

95.)    After meeting with Defendant Weiss Plaintiff met with his Counsel for the first time, Defendant Hall asked Plaintiff "did he think his Wife was above the law" and what she meant by "the police have no jurisdiction".

96.)    Plaintiff asserted to his counsel that "everyone has the right to feel safe in their own home" and "simply because someone comes in the name of law does not mean that the principles of law have been applied".

97.)    Plaintiff further stated that via the 4th amendment  his family had a reason to expect privacy at 2 AM in the morning at their home and that ACS was called the previous day in the early afternoon by a neighbor who in fact did not call police or an ambulance and so there were clearly no emergencies or exigent circumstances, it was almost 7 hours later that

the police were called by an aggressive agent Defendant Nsofu who "couldn't get her way" with an investigation.

98.)    Upon information and religious belief Plaintiff asserts his Wife was made a Queen by God the same way Europeans have claimed historically; however, her authority as Matriarch is that of her immediate Family *only* and her home is her "jurisdiction". Further, she was asserting her constitutional right to be free from unreasonable searches and seizure.

99.)    Upon information and religious belief Plaintiff asserts that the Title Queen is widely used by African American women in the United States, as a way of reclaiming lost heritage. Some examples of people with these titles within the United States include: *"Queen Beyoncé", "Queen Latifah", "Queen Afua", "The Queen of Soul"* who is Aretha Franklin among many others.

100.)   These titles are greatly connected to our peoples religious and spiritual beliefs, historically.

101.)   Plaintiffs Wife Ms. King is in a program called CASES.

102.)   Plaintiffs Wife Ms. Kings mental health assessment was based solely on her spiritual beliefs as stated in her CASES paperwork from Bellevue & Kirby Mental Health Hospital.

103.)   On May 2nd Plaintiff was forced by Defendant DA and Weiss to "Continue" mental health treatment as a condition of probation when in fact Plaintiff never had any mental illness. Defendant DA and Weiss acted outside of their delegated duties as prosecutors by

giving Plaintiff medical advice and direction as practitioners of medicine when it decided to make mental health treatment a condition of probation.

104.)    Plaintiff was never diagnosed by a Doctor or declared BRAD H at Rikers mental health clinic.

105.)    Plaintiff was forced into a mental health assessment which he passed with flying colors after his release and Doctor Viga Naik Psychiatrist for NEW YORK HEALTH + HOSPITALS METROPLITAIN stated that Plaintiff *"did not qualify for their mental health treatment programs"* offered by the hospital and that he was medically cleared and did not appear to have a mental illness as purported by ADA Weiss.

106.)    Upon information and belief Plaintiff asserts it was his *"religious beliefs"* that compelled Defendant Weiss and others to discriminate against him and used mental health as a scape goat to avoid unlawful detention charges for the city.

### WISE TOWERS MANAGEMENT O/B/O NYCHA GIVES THE DA FALSE INFORMATION ON PLAINTIFFS IDENTITY AND OBTAINS DEFAULT JUDGEMENT IN HOUSING COURT BY NOT SERVING PLAINTIFF.

107.)    At all times material defendant WISE TOWERS was under the direct supervision, authority, employ and control of Defendants NYCHA and THE CITY OF NEW YORK.

108.)    On or about Feb 27th Plaintiff returned home to his Wise Towers 74 West 92nd street apartment at around 6am regarding the events that took place earlier that morning.

109.)    When the plaintiff reached his door there was a small padlock out front, however no notice that one could not enter and so Plaintiff waited outside until the management office opened across the street.

*110.)*    When the management office opened the Plaintiff spoke to a housing manager about whether or not he was locked out due to something other than the events that had taken place last night, the manager had no knowledge of any lockouts and defended that *"it was not by any actions of management"*.

111.)    Plaintiff later that morning had the lock clipped to access his apartment. The housing manager also updated Plaintiffs name in their system in response to a legal action that was commenced one month prior to the arrest of Plaintiff where Plaintiff was suing NYCHA for not updating his legal name change approved by a NY Judge back in 2016.

112.)    Plaintiff changed his name from Sean Thurman to John De'Bey. These actions led the plaintiff to be seen as a "flight risk" and bail was set at one hundred thousand dollars because of it.

113.)    NYCHA and its contracted management WISE TOWERS although given multiple certified copies of the name change court order kept the name Sean Thurman in their system for over 3 years, and has caused Plaintiff hardships such as not being able to prove where he lives, denied a copy of his lease, denied access to request his own account information to pay his rent, and eventually was used against him in THE PEOPLE OF THE STATE OF NEW YORK V JOHN DE'BEY.

114.)    The DA claimed Plaintiff although had no prior criminal record may flee from

prosecution due to purportedly using multiple names such as NYCHA furnishing incorrect

records of their tenants' name SEAN THURMAN to the NYPD.

115.)    Using this Information, the DA argued that plaintiff should be a flight risk. Plaintiff

was remanded on a $100,000 bond / $50,000 cash excessive bail.

116.)    Plaintiffs name remained SEAN THURMAN in NYCHAs system although he

furnished financials in the name John De'Bey since 2016 on and NYCHA used financials

belonging to Mr. De'Bey to renew his lease each year but failed to update his name causing

legal problems and damages for Plaintiff.

117.)    NYCHA participated in the investigative process with ACS/CPS and the DA.

118.)    NYCHA served a motion for judgement to vacate the premises in housing court.

119.)    NYCHA failed to inform the housing court judge that both Plaintiff and his wife

were currently being detained on Rikers island.

120.)    NYCHA served Plaintiff at his residence where they knew Plaintiff would not be due

to his detainment.

**DEFENDANT EIEL UNLAWFULLY CONFISCATES PLAINTIFFS PHONE, DEMANDS
PASSWORD, THEN FAILS TO PROVIDE VOUCHER OR RECEIPT BREAKING
("RCNY") NYPD EVIDENCE PROTOCOL.**

121.)     At all times material defendant EIEL was under the direct supervision, authority, employ and

control of Defendants DISTRICT ATTORNEYS OFFICE OF MANHATTAN, NEW YORK CITY

POLICE DEPARTMENT and THE CITY OF NEW YORK / COUNTY OF MANHATTAN.

122.)     On February 27 at about 9:30 pm Plaintiff went outside of his apartment for a walk

and when he got downstairs the same woman who had called ACS unknowingly to the

Plaintiff at the time informed him that "there were detectives looking for him".

123.)     Plaintiff went directly to the detectives to see what they had to say. Two male and

one female detective jumped out of a black vehicle and asked if Plaintiffs name was Sean

Thurman and Plaintiff responded that he had not been addressed by that name in over 3

years since it has been changed.

124.)     The female detective defendant Eiel asked if plaintiff if he had an ID on his person,

plaintiff responded no and that his ID was upstairs in the apartment.

125.)     Plaintiff did provide a business bank debit card along with other financial cards to

establish his identity to authorities.

126.)     Defendant Eiel asked plaintiff further if he wanted to know the whereabouts of his

children and plaintiff responded: *Yes, but if any further details are needed, I would need to*

*speak to an attorney.*

127.)     Plaintiff was then asked to come to the station where they would tell me more about

what happened.

128.)    Plaintiff was not under arrest at the time and was not cuffed upon entering the back

of the detective's vehicle.

129.)    It was to the plaintiff's knowledge that he was only going to the station to learn

about what had happened earlier that morning.

130.)    When plaintiff got to the precinct he walked on to an elevator and believes it took

them downstairs to a unit area, this is where Defendant Eiel played a solo role in asking

plaintiff to place his cellphone into a bin on top of a file cabinet for safe keeping..

131.)    Plaintiff thought of it as house rules or protocol and did not know that his phone was

being confiscated by police for investigative purpose.

132.)    Plaintiff was questioned by Defendant Eiel about his relationship with the mother of

the children Sylfronia King, Plaintiff asserted that the mother was a good woman and took

care of his children as to his own knowledge.

133.)    Defendant Eiel then left the room and returned with pictures of the plaintiffs'

daughter Afia in which Plaintiffs daughter had appeared to have lost a significant amount of

weight from the time Plaintiff left his home.

134.)    Defendant Eiel asked plaintiff if the girl in the photo his daughter and plaintiffs'

response was: *Yes, but she looks a lot smaller than she did when he had last saw her over 7*

*days ago*, plaintiff added.

135.)    Defendant Eiel then read plaintiff his Miranda rights and plaintiff responded that he did not know how his words would be used against him in a court of law seeing that words could be manipulated to mean anything.

136.)    Defendant Eiel had already been told by Plaintiff earlier back at the residence that "anything further than explaining where his children were would require legal counsel".

137.)    Defendants did not follow ministerial guidelines for evidence in which the city defendant are responsible for training officers to follow.

138.)    Defendants demanded Plaintiffs password multiple times while making threats for harsher punishment.

139.)    Defendant Eiel delivered Plaintiffs cell phone directly to defendant ADA Weiss without a court order from a Judge nor a signed voucher from Plaintiff.

140.)    The act of taking the Plaintiffs phone and invading his privacy without a warrant is a violation of the 4th amendment and is upheld by **Riley v. California, 134 S.Ct. 2473 (2014)**

141.)    To this present-day Plaintiff has not received his phone back from the NYPD, Defendant Weiss or The District Attorney's Office of Manhattan.

**THE CITY OF NEW YORK, FAMILY COURT OF MANHATTAN, ACS, NEW YORK FOUNDLING AND DEPARTMENT OF CORRECTIONS IN CONCERT VIOLATE PLAINTIFFS SUBSTANTIVE AND PROCEDURAL DUE PROCESS BY WITHHOLDING PLAINTIFFS CHILDREN FOR OVER 47 DAYS WITHOUT A SUMMONS, VISITATION, A POST DEPREVATION HEARING OR ACCESS TO THE COURT WHILE IN STATE/CITY CUSTODY AS REQUIRED BY LAW.**

TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York

142.)     At all times material defendants ACS, THE NEW YORK FOUNDLING and

DEPARTMENT OF CORRECTIONS was under the direct supervision, authority, employ and

control of Defendant THE CITY OF NEW YORK.

143.)     Plaintiffs children were taken on or about February 27th 2019 without a court order.

144.)     Defendant ACS filed a petition on the same day February 27th 2019.

145.)     Defendant ACS was required under **Family Court Act - FCT § 1036. Service of summons**
to send Plaintiff a copy of the petition and summons so that he may have knowledge of the

allegations made against him and to be properly produced for a post deprivation hearing required by

law.

146.)     Defendant ACS did not serve Plaintiff with a summons although Plaintiff was in custody of

the Department of Corrections controlled and operated by its parent The City of New York.

147.)     It is a fact that from February 27th 2019 until March 12th 2019 Plaintiff was detained at

Manhattan Detention Center, only 2 blocks away from The Manhattan Family Court.

148.)     Plaintiff asked his counsel every time he saw said counsel about Family Court dates and

when he'd be produced, Plaintiff received no answer.

149.)     On April 15th 47 days later Plaintiff was finally produced into Family Court to learn that his

children were placed in foster care around March 10th 2019.

150.)     The Family Court never attempted to contact Plaintiff although they knew his location and

further knew that a post derivational hearing was due within the first week of the children being

removed pursuant to **Family Court (FCT) Section 1027: Hearing and preliminary orders after filing of petition (a).**

151.)     The New York Foundling is the foster care agency responsible for maintaining connections with the children, parents and foster parents, meanwhile never "reached out" to Plaintiff at any time about his children while in their care & custody.

152.)     The New York Foundling never arranged any visitation (Chip Visits) for Plaintiff.

153.)     The New York Foundling didn't mail Plaintiff any letters informing him of his children's conditions, placement and or photos for Plaintiff to hold on to.

154.)     At a permanency plan hearing in Family Court of Manhattan around the 2nd week of November 2019 Mr. Ansong a caseworker for The New York Foundling admitted that there were no attempts to communicate between the agency and the Plaintiff during his detainment on Rikers Island.

155.)     ACS did not contact Plaintiff regarding his children at any time during his detainment, although they knew his exact location.

156.)     Department of Corrections Ignored Plaintiffs requests to be produced in family court which Plaintiff informed the workers is mandated by **Tile 40: Department of Corrections section 5.) Access to the courts and the U.S Constitution 4th and 14th amendments.**

157.)     As to all defendants this was an obvious ministerial act that was not performed, with not even an apology or sympathetic response for their actions.

158.)     This separation from the children among other factors is what lead Plaintiff into entering into a plea deal with the DA to reunify with his children to whom in which he has a duty of care to.

## THE DOUBLE BURDEN OF SERVERE MALNUTRITION
### (District Attorney, Weiss, ACS)

159.)     Plaintiff was accused of knowing his 7-month-old daughter was severely malnourished on Feb 27th, 2019

160.)     Plaintiff nor his Wife were accused of starving their children.

161.)     Plaintiff nor his Wife were accused of purposely bringing harm to their children.

162.)     Plaintiff entered a plea deal on May 2nd, 2019

163.)     Plaintiff under coercion admitted that he did feed his daughter a strict vegan diet

164.)     Plaintiff admitted that he was with his daughter on Feb 16th, 2019.

165.)     Plaintiff under coercion admitted that he knew his daughter was underweight since January of 2019.

166.)     Plaintiff admitted that he did not take his daughter to seek medical services at any time.

167.)     Plaintiff did not feed his daughter a strict vegan diet, because plaintiff did not feed his daughter at all, the Mother handled this responsibility and Plaintiff paid for all the food in the home.

168.)     Plaintiff asserts that the plea deal does not convey nor articulate that an actual crime took place.

169.)     Upon information and belief, it is not a crime for a child not to eat meat in the U.S when associated with the Family's religious preference.

170.)    Upon information and belief, it is not a crime for a Father to be with his daughter on any given day.

171.)    Upon information and belief, it is not a crime to refuse the advice from doctors, if you do not trust them and due to past and present betrayals to Plaintiff and to the African American community Plaintiff asserts he has no obligation to their opinions and no Federal or State government can force one to participate in the practice of medicine and that if such law exists he has yet to find it.

172.)    Upon information and belief, if the U.S Congress has the right to control the diets of all Americans of any age through its commerce clause, then it should introduce a public bill that reflects such claims as to give clarity to any concerned citizen of their right to eat according to their beliefs and to give the people the right to challenge such claims as unconstitutional in an article III court.

173.)    Plaintiff does not believe that Congress has such authority over private citizens.

174.)    Plaintiff and his Wife pled guilty to being vegans, however no law exists prohibiting a vegan diet to either adults or children.

175.)    Plaintiff defends the fact that simply because a rule or law doesn't exist does not mean that a minimal standard of care is not owed to one another, but that when performing duties as a parent one cannot be held to be perfect in the management, custody of the child. Everyday is a new challenge for a parent and diets are an important aspect of a child's life. Plaintiff and his wife did not feed the Children meat but did allow the consumption of dairy products for protein purposes, which are found in most baby foods. Further it is impossible for a 7 month to chew meat without teeth.

176.)    Plaintiff and his Wife did not feed the children foods packed with sugar or high fructose corn syrup as these foods can lead to childhood obesity, hypertension, diabetes, cancer and more.

177.)    It is a fact that According to the World Health Organization and the CDC many children are at risk because of these dangerous foods introduced in the Regan era by a weakened U.S economy that forced farmers to grow strictly corn crops for the mass production of High fructose corn syrup.

178.)      Upon information and belief, it is not a crime to be underweight as it is not a crime to be overweight, as our society bears the double burden of malnutrition and in order to prosecute one the other must also be prosecuted to meet the standards of the equal protection clause of our nations Constitution.

179.)      According to the World Health Organization there is a double burden of server malnutrition.[4]

180.)      This double burden of malnutrition can exist at the individual level – for example obesity with deficiency of one or various vitamins and minerals, or overweight in an adult who was stunted during childhood – at the household level – when a mother may be overweight or anemic and a child or grandparent is underweight – and at the population level – where there is a prevalence of both undernutrition and overweight in the same community, nation or region.

181.)      According to the CDC Obesity now affects 1 in 5 children and adolescents in the United States.

182.)      Upon information and belief severe malnutrition is not a physical injury and it is classified as a medical condition. Medical condition examples are *"Cancer, Diabetes, Leukemia, Mental health conditions and more"*. These types of medical conditions are caused by internal forces, while physical injuries are caused by external forces used as vehicles in an assault such as a weapon i.e. "Guns, *Knives, Physical force, Poison, etc.*"

183.)      There were no external vehicles used to harm Plaintiffs daughter and no intentional torts, therefore no assault ever existed or occurred.

184.)      According to ABC 12 News in Arizona two parents were arrested for keeping an underweight and malnourished child who was exposed to a substance from local authorities after a court ordered the removal of the child via warrant. The couple were only arrested for keeping the child from authorities, they were not arrested for the malnourishment of their child, further they were both released on their own recognizance and not remanded on felony charges.[5]

185.)      Defendants took the Plaintiffs constitutionally secured interest in the custody, management and welfare of his child and converted it into a crime.

---

[4] https://www.who.int/nutrition/double-burden-malnutrition/en/ Last Visited 2/2/2020
[5] https://www.12news.com/article/news/crime/couple-arrested-for-allegedly-keeping-underweight-substance-exposed-newborn-from-arizona-custody/75-e4147139-9253-42c5-8f24-7b4db1f3ed02 Last Visited 2/2/2020

**TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

**DEFENDANT HALL VIOLATES HER CLIENTS CONSTITUTIONAL RIGHTS TO BE HEARD, WITHHELD EVIDENCE, WAIVED GRAND JURY AND GAVE FALSE INFORMATION AS TO THE TERMS OF THE PLEA-BARGAINING AGREEMENT**

186.)    On or about first week of March 2019 Plaintiff spoke to his counsel Defendant Hall and demanded that he be sent in front of the Grand Jury.

187.)    Defendant Hall responded that they would cross that bridge when they got there.

188.)    When the time came for Grand Jury Plaintiff asked to go in front of the Grand Jury.

189.)    Defendant Hall asserted that it was her right whether Plaintiff would see a Grand Jury.

190.)    Plaintiff believes Defendant Hall was compromised for multiple reasons, one being the fact that counsel acts in the position of her client and that counsel could have been waived and Plaintiff could have received a Grand Jury by request himself.

191.)    Plaintiff filed for himself a 180.80 motion to release defendant for failure to dispose of a felony complaint.

192.)    Plaintiff admits he sent Defendant Halls copy of the motion to the wrong address as he did not know who she worked for at the time and so he assumed it was the legal aid society, but it was actually County Defenders Services.

193.)    Nonetheless, Plaintiff informed his Counsel in person that week of the motion and gave her full disclosure as to what his intent was for filing it.

194.)    Plaintiff believes that the motion he filed was the only motion ever filed in his favor.

**TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

195.)     The motion was not answered at any time.

196.)     Defendant Hall with full knowledge of how the DA received Plaintiffs phone without a warrant kept demanding the password from her own client.

197.)     Plaintiff argued although there were no illegal items in his phone that his phone met the exclusionary rule and was that of the "fruit of the poisonous tree" as the evidence was obtain by <u>theft and not a warrant.</u>

198.)     Plaintiff requested the accusatory instrument filed by the DA from Defendant Hall on Mar 12th 2019.

199.)     Plaintiff waited over a month to receive his own criminal complaint from Defendant Hall on April 14th 2019.

200.)     When Plaintiff read the complaint, he realized that the information in the complaint was invalid, incomplete, misleading and unintelligible on its face.

201.)     Plaintiff asked Defendant Hall for the discovery.

202.)     Plaintiff never received discovery.

203.)     Plaintiff asked Defendant Hall to file a Brady motion and if unsuccessful to follow up with a Vaughn motion if the first did not render effect.

204.)     Plaintiff believes these motions were never filed.

205.)     In mid-April Defendant Hall tells Plaintiff that she can get a plea deal for him.

206.)     Plaintiff asked how?

207.)     Defendant Hall simply responds that she *"knows Ms. Weiss personally"*.

208.)     Defendant Hall follows up with the plea terms which were 3 years unsupervised probation, non-reporting status, no travel restrictions and that Plaintiff was to remain out of trouble. If Plaintiff were to have any police, contact in New York that Plaintiff could be rearrested and sentenced by law.

209.)     When plaintiff went to court the Judge asked did Plaintiff and Defendant Hall discuss the terms of such agreement.

210.)     Plaintiff responded: Yes. And agreed to the deal as it was discussed between himself and Defendant Hall.

211.)     When Plaintiff was released, he had realized that Defendant Hall lied about the terms of the plea deal and that he did have travel restrictions and a reporting status which is now hurting his business. He also must report to probation bi-weekly.

**FALSE MEDICAL REPORT**

**(NYC HEALTH + HOSPITALS | METROPLOTAIN)**

212.)     On July 24th 2019 Plaintiff went to the mental health clinic as part of his condition of probation.

213.)     Plaintiff saw Psychiatrist Viga Naik.

214.)     Plaintiff spoke with Dr Naik about his current condition, his children and ACSs involvement.

215.)    Plaintiff told Dr. Naik that he was trying to have his children placed with his Mother and sister in Queens NY.

216.)    Plaintiff further told Dr. Naik that he was suing The City of New York for violations of the Constitution.

217.)    At the end of Plaintiffs session, he was told that he was mentally cleared and that he would receive a letter in the mail stating he does not qualify for their mental health treatment plans.

218.)    On or about 2nd week of August plaintiff received the event result report from Defendant Metropolitan.

219.)    Plaintiff was shocked to see that on page 3 of that report that the doctor indicated that both his Mother and Sister were suffering from bipolar disorder.

220.)    Upon information and belief Metropolitan would have needed a HIPPA to release Plaintiffs Mother and Sisters medical condition to him or another 3rd party.

221.)    When Plaintiff informed his Mother of this, she too was shocked and stated that she had never been diagnosed as bipolar from any doctor and same for Plaintiffs Sister.

222.)    Defendant knew that Plaintiff wanted to place his children with his Mother and Sister.

223.)    Ironically an unsubstantiated note regarding their mental health status is attached to Plaintiffs personal medical record.

224.)    Defendant Metropolitan is a creature of The City of New York.

## DAMAGES

225.)    . As a direct and proximate result of the acts of defendants, plaintiff suffered the following injuries and damages:

a. Violation of his rights pursuant to the First Fourth, Fifth, Sixth and Fourteenth Amendments to

- 35 -

the United States Constitution and to be free from an unreasonable search and

seizure of their person;

b. Violation of his right to Due Process of Law under the Fourteenth

Amendments to the United Stated Constitution;

c. Violation of his New York State Constitutional rights under Article 1,

Section 12 to be free from an unreasonable search and seizure;

d. Violation of his New York State Constitutional rights under Article 1, Section 6 to due process;

e. Physical pain and suffering;

f. Emotional trauma and suffering, including fear, embarrassment, humiliation,

emotional distress, loss of consortium frustration, extreme inconvenience, anxiety;

g. Loss of liberty & Family.

h. Loss of earnings

i. Loss of contracts

**COUNT I – UNREASONABLE SEARCH AND SEIZURE | CONSPIRCY TO DEPRIVE**

**CIVIL RIGHTS 4th & 14th Amendment (42 USC § 1983)**

**(FEBUARY 27th, 2019  HOME TRESPASS & CONSPIRACY)**

**(Against Defendants' ACS, NYPD Castellanos, Nsofu & Weaks)**

Plaintiff incorporates the preceding paragraphs by reference herein.

226.)      Defendants have deprived plaintiff of his civil, constitutional and statutory rights

under color of law and have conspired to deprive him of such rights and are liable to

plaintiff under 42 USC § 1983 § 1985 and § 1988 (b).

227.)      Defendants' conduct deprived plaintiff and his family of their right to be free of

unreasonable

searches and seizures, pursuant to the Fourth and Fourteenth Amendments to the United

States Constitution. **See exhibit A (Vicitms)** Defendants' conduct also deprived plaintiff of

his right to due process of law, pursuant to the Fourteenth Amendment of the United States

Constitution.

228.) Defendants created a false scenario that lead to the plaintiffs' arrest and both failed

to intervene in each other's obviously illegal actions.

229.) Plaintiff believes, and therefore avers, that Plaintiff's refusal to co-operate with an

ACS investigation led Defendant ACS to retaliate against his family by abusing police

powers and breaking into his home.

230.) Police & ACS acted in concert.

231.) Plaintiffs refusal to allow defendants in his home without a warrant is protected by

the 4th &14th amendments of the U.S Constitution and The New York State Constitution.

232.) Defendant Nsofu and Castellanos actions were unlawful and violated federal and

state laws and would chill the average person while asserting such right to be free from a

warrantless and unreasonable search and seizure in the early AM.

233.) Defendants actions although ministerial through CAPTA and other congressional

bills violates the 4th amendment when applied to the facts and circumstances of this case.

234.) CAPTA does not authorize warrantless searches nor grants special powers to police

& ACS/CPS during an investigation.

235.) Upon information and belief, Congress made it clear in all bills pertaining to child

welfare that all agents were still bound by Federal Law and the United States Constitution

while carrying out their investigations.

236.) Upon information and belief according to the Supreme Court police and ACS do not

have a duty of care to protect private individuals when not in their custody, from non-State

actors. **DeShaney v. Winnebago County Department of Social Services, 489 U.S. 189**

**(1989).** Police and ACS did not have the children in their custody and therefore do not qualify to assert a duty was owed **"no custody, no duty"**.

237.)     Upon information and belief according to the Supreme Court all immunity including *"Qualified Immunity"* is attached to the tasks of an official and it must relate to an actual duty that must be performed. If no Duty exists, then no immunity exists.

238.)     Upon information and belief because both Police & ACS did not owe a duty to the defendant's daughter, they have no grounds to violate the 4th and 14th amendment of the constitution, even with a tip from a hotline.

239.)     As a result of Defendants conduct, Plaintiff suffered damages.

240.)     Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, and breach of ministerial acts, Plaintiff is entitled to recover general, punitive and actual damages against the individual defendants.

## COUNT II – FIRST AMENDMENT RELIGIOUS DISCRIMINATION

### 1st Amendment (42 USC § 1983)

### (FEBUARY 26, 2019 - PRESENT)

### (Against Defendants' ADA Sara Weiss, CPS, Nsofu & Elie.)

Plaintiff incorporates the preceding paragraphs by reference herein.

241.)     Plaintiff believes, and therefore avers, that Plaintiff's religious beliefs is the bases for Defendants claims against Plaintiff.

242.)     Defendants believes that because Plaintiff subscribes to a vegan diet, that he forces his daughter to eat a strict vegan diet, this is far from the truth. Plaintiff has religious beliefs as to refrain from the consumption of animals unless used in a ritual or special occasion

- 38 -

according to the AKOM. Plaintiffs daughter enjoyed baby foods provided by Beech Nut, Gerber, Dairy Milk and other foods that are purchased for infants and consumed lawfully. These products did contain dairy ingredients.

243.) Plaintiff admits that he never gave his daughter any meat products but that constitutes partial vegan and not fully vegan (lacto-vegetarian) debunking the strict vegan diet theory provided by Defendant ADA Weiss.

244.) Defendants prosecuted Plaintiff for endangering the welfare of a child for failing to subscribe to a western diet that would go against what he believed in.

245.) Defendants cannot prove that not eating meat is what caused his daughters rapid weight loss, as Plaintiffs son ate the same diet and never had difficulties gaining and maintaining his weight. Further Plaintiffs daughter did not have teeth at the time and couldn't consume meat even if she wanted to.

246.) As a result of Defendants conduct, Plaintiff suffered damages.

247.) Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Right to worship without being forced into what defendants believed to be a good diet. As a result of the nature of Defendant's outrageous conduct, Plaintiff is entitled to recover general & punitive damages against Defendant Elie, Nsofu and CPS.

248.) Plaintiff is entitled to injunctive relief as to Defendants from further religious interferences.


## COUNT III – ADMINISTRATIVE NEGLIGENCE (Breach of common law duty of care)

## (Against Defendants' NYCHA & WISE TOWERS)

The Plaintiff incorporates the preceding paragraphs by reference herein

249.)    As a landlord providing apartment rentals to the public when signing a lease with a tenant landlords owe a unique duty of care to their tenants, not limited to accurate names appearing on a lease and updating crucial information such as a name change when a Judge orders the recipient to do so by judicial authority.

250.)    Plaintiff asserts that back in 2016 he underwent a name change and provided copies for Wise Towers and NYCHA to update his lease. Plaintiff paid out of pocket for 5 copies. Every few months Plaintiff followed up on the status of the update. NYCHA and its management Wise Towers failed to update their tenant's records for over 3 years.

251.)    Wise Towers renewed Plaintiffs lease each year under his previous name denying him access to a lease with his current name, Plaintiff could not bring his lease to the bank or to apply for services that required proof of residence. Plaintiff has been denied rental statements by NYCHA themselves and the ability to pay his own rent due to this failure to update his name.

252.)    As a result of Defendants conduct, Plaintiff suffered damages not limited to being remanded by State court in THE PEOPLE OF THE STATE OF NEW YORK V JOHN DE'BEY for purportedly using multiple identities and therefore labeled a flight risk by the DA.

253.)    Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his right to a lease. As a result of the nature of Defendant's conduct, and breach of duty, Plaintiff is entitled to recover general & punitive damages against Defendant NYCHA and Wise Towers.

**COUNT IV – UNREASONABLE SEARCH AND SEIZURE 4th 5th and 14th amendments (FEBUARY 27th, 2019 RE: CELL PHONE) (Defendant City of New York, Defendant NYPD, Defendant Eiel, and Defendant Weiss)**

The Plaintiff incorporates the preceding paragraphs by reference herein

254.) Plaintiff believes and therefore avers, that defendants acted in concert to deprive him of his personal mobile cell phone for the purpose of accessing private information without a court order.

255.) Plaintiffs phone was taken prior to the arrest for so called safekeeping and was not automatically deemed evidence according to **Subchapter B: Procedures Relating to Property Taken or Obtained In Connection With An Arrest. Rules of the City of New York ("RCNY")** § *12-31 Definitions.*

256.) Plaintiff asserts Defendants did not give Plaintiff a voucher or receipt for his phone before or after his arrest, Plaintiff was entitled to receive a voucher for his phone according to Rules of the City of New York ("RCNY") *§ 12-32 Vouchering Procedures.*

257.) Plaintiff had reason to belief his phone would be free from an unauthorized search and seizure via the 4th amendment and would shock the conscious of the average man or woman.

258.) Defendant's actions were unlawful and unconstitutional and meets the test set forth in Riley V. California.

259.) Defendants acted in a manner with no regard for the law of the land and principles of our constitution.

260.) Defendant city and NYPD are also responsible for its inexcusable failure to train its officers on their ministerial duties regarding Plaintiffs mobile device considering the constitution and the previous supreme court ruling in Riley V. California.

261.) This was a violation of both procedural and substantive due process.

262.) As a result of Defendants conduct, Plaintiff suffered actual damages by way of lost business files, photo of family members, business ideas, and evidence in his favor RE: THE PEOPLE OF THE STATE OF NEW YORK V JOHN DE'BEY.

263.) Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, and breach of ministerial acts, Plaintiff is entitled to recover general & punitive damages against Defendant Eiel and NYPD.

264.) Plaintiff is further entitled to injunctive relief as to Defendant District Attorney of Manhattan & ADA Sara Weiss, and to have his phone returned to him or replaced.

**COUNT V – DUE PROCESS VIOLATION 5th & 14th Amendment Claim (RE: Post Deprivation Hearing) (Defendant City of New York, Defendant Family Court of Manhattan)**

Plaintiff incorporates the preceding paragraphs by reference herein.

265.) Plaintiff believes, and therefore avers, that his 5th & 14th amendment rights were violated when the Family Court of Manhattan failed to timely produce Plaintiff into its venue for a post deprivation hearing required by law.

266.) This was a violation of both procedural and substantive due process.

267.) Plaintiff had a reason to expect to be produced into Family Court to hear about the status of his children, this expectation is backed by well-established constitutional principles not limited to the interest, management and custody of the children and **Family Court (FCT) Section 1027: Hearing and preliminary orders after filing of petition (a).** Procedural due process generally requires a hearing prior to depriving a parent of custody or a prompt post-deprivation hearing if the child is removed under emergency circumstances. See, e.g., Kia P., 235 F.3d at 760 n. 4; Tenenbaum, 193 F.3d at 593. Substantive due process protects individuals from arbitrary government intrusions by requiring a reasonable basis or justification for such actions. See, e.g., Kia P., 235 F.3d at 758-59; People United for Children, 108 F. Supp.2d at 292-93.

268.) Parents "have a constitutionally protected liberty interest in the care, custody and management of their children," and family members have a fundamental right under the Fourteenth

- 42 -

Amendment to remain together. Tenenbaum v. Williams, 193 F.3d 581, 593 (2d Cir. 1999); see also Nicholson, 203 F. Supp.2d at 233-37. Thus, while "the State has a profound interest in the welfare of the child," interference with family integrity must comport with procedural and substantive due process, as well as rights under the Equal Protection Clause and Fourth Amendment, among other provisions. Tenenbaum, 193 F.3d at 593-94; see also Phifer v. City of New York, 289 F.3d 49, 57-62 (2d Cir. 2002); Kia P. v. McIntyre, 235 F.3d 749, 757-63 (2d Cir. 2000); Nicholson, 203 F. Supp.2d at 236-49; People United for Children v. City of New York, 108 F. Supp.2d 275, 292-300 (S.D.N.Y. 2000).

269.)     This hearing was a Ministerial function and was not performed.

270.)     As a result of Defendants actions Plaintiff suffered damages and further from mental anguish, loss of consortium, migraines, night terrors and is currently in therapy treatment at the Beverly Mack Center.

271.)     Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, and breach of ministerial acts, Plaintiff is entitled to recover general & punitive damages against the Family Court of Manhattan and City Defendant.

**COUNT VI – DUE PROCESS VIOLATION 5th, 6th & 14th Amendment Claim (RE: Family Court Summons) (Defendant ACS)**

Plaintiff incorporates the preceding paragraphs by reference herein.

272.)     Plaintiff believes, and therefore avers, defendant ACS purposely failed to serve Plaintiff a copy of the Family Court petition to deprive him access to his children and a fair hearing.

273.)     Plaintiff had reason to believe that he would be entitled to receive an accusatory instrument filed against him governed by the 6th amendment of the U.S Constitution and **Family Court Act - FCT § 1036. Service of summons**

274.)     Although Family Court isn't a criminal trial the Plaintiffs life and pursuit of happiness in connection with the management and custody of his children were at stake.

275.)     As a matter of Law when protected constitutional interests are at stake no government entity has the right to create a venue that would disregard such principles.

276.)     Plaintiff asserts that to not receive due notice regarding one's own children in a court proceeding that would not only affect the relationship of the Father but also of the child would shock the conscious of the average individual.

277.)     This was a violation of both procedural and substantive due process.

278.)     As a result of Defendants conduct, Plaintiff suffered damages.

279.)     Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, and breach of ministerial acts, Plaintiff is entitled to recover general & punitive damages against ACS.


## COUNT VII – (MUNICIPAL AND SUPERVISORY LIABILITY)
## (THE CITY OF NEW YORK & COUNTY)

Plaintiff incorporates the preceding paragraphs by reference herein.


280.)     The City is liable for the damages suffered by plaintiff as a result of the conduct of their employees, agents, and servants, in that, after learning of their employees' violation of plaintiff's constitutional rights, they failed to remedy the wrong; they have created a policy or custom under which unconstitutional practices occurred and allowed such policies or

customs to continue, and they have been grossly negligent in managing subordinates who caused the unlawful condition or event. The City has been alerted to the regular use of excessive force and false arrests by its police officers but has nevertheless exhibited deliberate indifference to such excessive force and false arrests; that deliberate indifference caused the violation of plaintiffs' constitutional rights in this case.

281.)     The aforesaid event was not an isolated incident. The City has been aware for some time, from lawsuits, notices of claim, complaints filed with the Civilian Complaint Review Board, and judicial rulings suppressing evidence and finding officers incredible as a matter of law, that a disturbing number of their police officers use excessive force, unlawfully search and seize citizens, bring charges against citizens with no legal basis, perjure themselves in charging instruments and testimony, and fail to intervene in and report the obviously illegal actions of their fellow officers. Nevertheless, the City has allowed policies and practices that allow the aforementioned to persist.

282.)     For example, the well documented failures of the Civilian Complaint Review Board ("the CCRB"), a City agency, to substantiate obviously meritorious citizen complaints have gone uncorrected. The CCRB regularly finds complainants lack credibility based on the fact that such complainants have also brought lawsuits to remedy the wrongs they have experienced, a practice that often results in not substantiating the most serious charges brought to them. In addition, the CCRB virtually never initiates their own findings of false statements against officers who have made false statements to the CCRB in their own defense, nor do they initiate findings that officers have failed to report their fellow officers' misconduct; thus, officers have no real incentive to come forward, or to testify truthfully at the CCRB. The CCRB has no enforcement mechanisms once making a finding against an officer; it can only make recommendations to the NYPD, once finding misconduct by an officer.

283.)     The NYPD, once receiving a substantiated complaint by the CCRB, fails to

adequately discipline officers for misconduct. The NYPD Department Advocate, which is

endowed with the responsibility of following up on substantiated CCRB charges, is

understaffed and under-utilized. Furthermore, in the extraordinarily rare event that the

CCRB substantiates a complaint and the Department Advocate proves the case in an internal

trial against an officer, the police commissioner still maintains the power to reduce the

discipline against such an officer.

284.)     Further, the City has no procedure to notify individual ACS agents and officers or

their supervisors of unfavorable judicial review of their conduct. Without this notification,

improper search and seizure practices and incredible testimony go uncorrected.

Additionally, according to a report of the New York City Bar Association issued in 2000,

the City has isolated their law department from the discipline of police officers, so that civil

suits against police officers for actions taken in their capacity as police officers have no

impact on the officers' careers, regardless of the outcome of the civil actions. Alan Hevesi,

as New York City Comptroller, in 1999 reported that there was a "a total disconnect"

between the settlements of even substantial civil claims and police department action against

officers.

285.)     The City is aware that all of the aforementioned has resulted in violations of citizens'

constitutional rights. Despite such notice, the City has failed to take corrective action. This

failure and these policies caused ACS agents and officers in the present case to violate

plaintiffs' civil rights, without fear of reprisal.

286.)     Plaintiffs have been damaged as a result of the deliberate indifference of the City to

the constitutional rights of the City's inhabitants.

287.)     The City is liable for the damages suffered by plaintiffs as a result of the conduct of

their employees, agents, and servants, in that, after learning of their employees' violation of

- 46 -

TITLE **42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

plaintiffs' constitutional rights, they failed to remedy the wrong; they have created a policy

or custom under which unconstitutional practices occurred and allowed such policies or

customs to continue, and they have been grossly negligent in managing subordinates who

caused the unlawful condition or event. The City has been alerted to the regular use of

forceful ACS removals made by police without warrants and false arrests by its police

officers, but has nevertheless exhibited deliberate indifference to such excessive force and

false arrests; that deliberate indifference caused the violation of plaintiffs' constitutional

rights in this case.

### COUNT VIII – (CONSPIRACY)

### (DA, ADA WEISS, ACS, NSOFU, CASTELLANOS)

Plaintiff incorporates the preceding paragraphs by reference herein.

288.)    Defendants agreed to violate the plaintiffs' rights in the manner described above.

Further defendants made an agreement to attempt to cover up the forced entry into Plaintiffs

home.

289.)    Defendants took action in furtherance of this agreement by arresting plaintiff and his

Wife and brought felony charges against them both for their daughters' medical condition of

severe malnutrition, which was at the time unknown to Plaintiff and out of his control.

290.)    Plaintiff believes that he was charged as part of a conspiracy to limit the defendant's

personal and municipal liability for breaking into his home without a duty of care, without a

warrant, without firsthand knowledge or exigent circumstances.

291.)    Plaintiff believes that defendants made up fictious charges of assault in 3rd degree

and reckless endangerment to remand him on an A misdemeanor charge which was the

original charge Plaintiff received at the precinct. Further plaintiff was recommended to be

released on his own recognizance by the court, until the DA trumped up the charges a day

after they had knowledge from Mount Sinai that the Plaintiffs daughter had a medical condition and not an injury.

292.)    Plaintiff was injured as a result of defendants' conspiracy.

293.)    Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his rights. As a result of the nature of Defendant's conduct, Plaintiff is entitled to general and punitive damages. Plaintiff is further entitled to injunctive relief to enjoin defendants from further attacking him.

## COUNT IX – DEFAMATION & ACTUAL MALICE New York State Claim, Supplemental Jurisdiction (RE: False ACS Report) (Defendant Elsa Gaston)

Plaintiff incorporates the preceding paragraphs by reference herein.

294.)    On or about Feb 26th 2019 Defendant Gaston called ACS on Plaintiffs Wife while he was away on business. Plaintiff believes and therefore avers, that Defendant Gaston stated that his son was an abandoned child and that both the mother and father did not want their son. This statement was made to ACS and other local law enforcement and is untrue and false.

295.)    Plaintiff is entitled injunctive relief to bar Defendant from making untrue statements in Family Court as a witness and to recover nominal damages and damages for emotional distress resulting from Defendants' defamation.

296.)    Defendants' conduct was engaged in with malice or reckless disregard for Plaintiff's rights. Accordingly, punitive damages are warranted.

**COUNT X – UNLAWFUL MEDICAL ASSEMENT 4th, 6TH & 14TH Amendment Claim (RE: THE STATE OF NEW YORK V JOHN DE'BEY) (Defendant District Attorney & ADA Weiss)**

Plaintiff incorporates the preceding paragraphs by reference herein.

297.)    Plaintiff believes, and therefore avers, Defendants accused Plaintiff of being mentally ill because they had no other claim against him. Plaintiff had no prior arrests, no drugs on his person or in his home, no weapons or other concerns.

298.)    Plaintiff does not recall a Psychiatrist informing him that he needed mental heath treatment.

299.)    Defendants made mental health treatment a mandatory condition of probation.

300.)    Defendants are not medical professionals and do not possess the authority to make medical decisions for Plaintiff.

301.)    Defendants acted out of the scope of their authority as District Attorneys.

302.)    As a result, Plaintiff suffered damages.

303.)    According to contract law Plaintiff is entitled to injunctive relief as to the mental health treatment condition of probation.

**COUNT XI – UNCONSTITUTIONAL PLEA BARGIN AGREEMENT 1st ,5th, 6st 9th & 14th Amendment Claim (RE: THE STATE OF NEW YORK V JOHN DE'BEY) (Declaratory Judgement as to Defendant District Attorney & ADA Weiss)**

Plaintiff incorporates the preceding paragraphs by reference herein.

304.)    Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983 &  § 1985.

305.)    Defendants' conduct deprived plaintiff of his right to eat a vegan diet, pursuant to the First and Fourteenth Amendments to the United States.

306.)    Defendants created a plea deal that did not articulate that Plaintiff had committed a crime.

307.)    Defendants never directly accused Plaintiff of hurting his daughter.

308.)    Defendants never accused Plaintiff of starving his daughter.

309.)    Defendants converted a right to eat into a crime.

310.)    Defendants took the Plaintiffs constitutionally secured interest in the custody, management and welfare of his child and converted it into a crime. **SEE:**

**Miller v. U.S.,** *The claim and exercise of a constitution right cannot be converted into a crime.*

**Simmons vs. U.S..** *"We find it intolerable that one constitutional right should have to be surrendered in order to assert another"*

**Miranda v. Arizona,** *"Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them ".*

**Stuck v. Medical Examiners,** *"Once challenged, jurisdiction cannot be 'assumed', it must be proved to exist."*

**Sherar v. Cullen,** *"There can be no sanction or penalty imposed upon one because of his exercise of constitutional rights"*

**Simmons v. United States,** *"The claim and exercise of a Constitution right cannot be converted into a crime"... "a denial of them would be a denial of due process of law. "*

311.)    Defendants withheld evidence from Plaintiff during the discovery phase in criminal court, violating the 5th and 6th amendments.

312.)    Defendants forced Plaintiff into a plea bargain agreement using his children as collateral by way of acting in concert with Defendant ACS to deprive Plaintiff of visitation and a hearing. Defendants did not have a sound claim and therefore the deal made was not a "mutuality of advantage" to Plaintiff quoting Supreme Court. **See:** Bordenkircher v. Hayes,

434 U.S. 357, 363 (1978) (internal quotation marks omitted) (quoting Brady v. United States, 397 U.S. 742, 752 (1970)).

313.)     Defendants knew Plaintiffs daughter was not injured and had only a medical condition before charging Plaintiff. Dr. Aydin of Mount Sini Hospital on February 27th used passive language when diagnosing Plaintiffs daughter when he stated that serve malnourishment could have led to brain damage, other medical conditions and finally that it could have also led to death. Indeed, these scenarios are possible, however in an unperfect world anything is possible. If you smoke cigarettes you could die of cancer, if you eat too much sugar you can be diagnosed as diabetic, if you drink too much water you could drown yourself, these too are all possible but they are not actual and cannot be guaranteed to occur. The doctors' diagnosis does not articulate that Plaintiffs daughter was in immediate danger of death and only that if she continued down that path of malnourishment, that it could lead to other complications.

314.)     Under the first, ninth & tenth amendment of U.S constitution plaintiff reserves his right for him and his family to eat what they wish, so long as it does not intentionally cause harm and does not affect the general public or public safety.

315.)     Defendants are aware or should be aware that there is a double burden of malnutrition. This means that if being underweight is a crime, then so is being overweight, otherwise it's discrimination as both are a critical state of health and are deemed the same disease according to the World Health Organization and the CDC.

316.)     Upon information and belief there are currently no laws prohibiting being underweight or overweight in the United States.

317.)     Defendants held Plaintiff on felony charges for laws that didn't exist, and in hopes that he'd copout to the lesser charge of endangering the welfare of a child due to her weight solely.

318.)    Plaintiff was forced into an unconstitutional plea agreement.

319.)    According to the Supreme Court in **Class V. United States: a Guilty Plea Doesn't Prohibit Constitutional Challenge to Convictions.**

320.)    Plaintiff was injured as a result of Defendants' acts.

321.)    Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct under contract law, U.C.C and the common law Plaintiff is entitled to injunctive relief against defendants and their plea-bargaining agreement for undue influence, misrepresentation, and fraud.

322.)    According to the supreme court a plea bargain agreement is still just an agreement and a court may treat it is if it were a standard contract governed by contract law.

323.)    Plaintiff is entitled to have this plea-bargaining agreement deemed non enforceable and or void ab initio.

324.)    Further, Plaintiff is entitled to declaratory judgement as to establish his rights under first, ninth and tenth amendments of the constitution, for him and his family to eat according to their religious beliefs without government intrusion.

**COUNT XII – DUE PROCESS VIOLATION 4th 5th & 14th Amendment Claim (RE: Perjury, Withholding Evidence & Obstruction of Justice, Unlawful Arrest) (Defendants ACS & Nsofu)**

Plaintiff incorporates the preceding paragraphs by reference herein.

325.)    Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983.

326.)    Defendants caused for a petition to be filed in the Family court of Manhattan.

327.)    In the original petition Defendants omitted the February 13th events.

328.)    Defendant lied committing perjury in an accusatory instrument against Plaintiff.

329.)    February 13th, 2019 if included in the petition would have raised red flags as to the possibility of the plaintiff being guilty of endangering the welfare of a child.

330.)    Defendants omitted the events to sway the court's opinion about Plaintiff in both Criminal and Family Court.

331.)    Plaintiff had reason to believe Defendant would operate with clean hands and tell the entire truth as it happened. But given the circumstances as to how Defendants gained access to Plaintiffs home, Defendant choose to cover herself to avoid liability.

332.)    Defendant ACS was fully knowledgeable about the events as they were stored in the agencies reporting system. The agency protected the unlawful practices and efforts of Defendant Nsofu.

333.)    According to the **Child Protective Service Manual section F: Immunity.** Immunity New York State law provides immunity from civil and criminal liability for child protective institutions and for their staff so long as they are acting in good faith in the discharge of their duties and within the scope of their employment and without willful misconduct or gross negligence in carrying out those duties **[SSL §419].** Acting in the discharge of one's duties as a CPS worker and within the scope of employment means that the CPS worker will have immunity for actions that are within the legal authority of the child protective provisions of the Social Services Law and OCFS regulations and within the CPS worker's job responsibilities. Thus, immunity might not be available to a CPS staff member who intentionally fails to comply with the requirements of the law and the duties of a child protective service. Immunity from liability does not preclude the initiation of criminal or civil proceedings, but rather provides a legal defense if such proceedings are commenced. The statute establishes a presumption of good faith for actions taken by the CPS worker in the performance of child protective duties.

334.)     Defendant obstructed justice, withheld evidence from Family court and a criminal proceeding. Filed an updated Petition for abuse while still leaving out the Feb 13th events to avoid personal liability for her actions.

335.)     Because of Defendants outrageous actions Plaintiff suffered damages. Defendant is responsible for the unnecessary removal of Plaintiffs children; Defendant is further responsible for Plaintiffs unlawful arrest and detainment as law enforcement went off of the words of the Defendant.

336.)     Defendants' acted willfully, knowingly and purposefully and/or with deliberate indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of Defendant's conduct, and betrayal of public trust, Plaintiff is entitled to recover actual, general & punitive damages against Defendant Nsofu. Plaintiff is further entitled to an injunction against both defendants to enjoin them from future attacks against Plaintiff and his Family.

**COUNT XIII – DUE PROCESS VIOLATION 5th & 14th Amendment Claim (RE: Tile 40: Department of Corrections section 5.) Access to the courts) (Defendants The City of New York & Department of Corrections)**

Plaintiff incorporates the preceding paragraphs by reference herein.

337.)     Defendants have deprived plaintiff of his civil, constitutional and statutory rights under color of law and have conspired to deprive him of such rights and are liable to plaintiff under 42 USC § 1983 and Title 40 Department of Corrections section 5.) Access to the courts.

338.)     Defendants' conduct deprived plaintiffs of his right to access the court systems for both Family and Housing court, pursuant to the Fifth and Fourteenth Amendments to the

United States Constitution. Defendants' conduct also deprived plaintiffs of his right to due

process of law, pursuant to the Fourteenth Amendment of the United States Constitution.

339.)    Defendants owed a duty of care to Plaintiff because he was always in their custody at

the times relevant to this claim.

340.)    Defendants denied Plaintiff on multiple occasions access to the courts for the sake of

his children and his place to live.

341.)    Plaintiff has been damaged as a result of defendants' wrongful acts.

342.)    As a result of this deprivation, NYCHA received a default judgement against

Plaintiff for not appearing in court. Plaintiff had to get the judgement vacated but loss

property as a result of the eviction process.

343.)    Plaintiff was deprived throughout his entire detainment of seeing and connecting

with his children for the DOCs failure to accommodate Plaintiffs access to the Family court.

344.)    Defendants' acted willfully, knowingly and purposefully and/or with deliberate

indifference to deprive Plaintiff of his Constitutional Rights. As a result of the nature of

Defendant's conduct, and breach of ministerial acts, Plaintiff is entitled to recover general &

punitive damages against The Department of Corrections and City Defendant.


**COUNT VIII – INEFFECTIVE COUNSEL 6ST Amendment Claim (RE: THE STATE OF**

**NEW YORK V JOHN DE'BEY) (Defendant Caitlyn Hall)**

Plaintiff incorporates the preceding paragraphs by reference herein.

345.)    Plaintiff believes, and therefore avers, defendant Hall failed to perform adequately as

his counsel. Plaintiff at the preliminary hearing was denied a copy of his own accusatory

instrument by his attorney who did not care to give her client a copy.

346.)    Plaintiff had reason to believe that he would be entitled to receive an accusatory

instrument filed against him governed by the 6th amendment of the U.S Constitution.

- 55 -

347.)    Defendant Hall did not provide Plaintiff with any discovery from the DA.

348.)    Defendant Hall did not file a Brady or Vaughn motion to see whether plaintiff had any evidence in his favor.

349.)    Defendant Hall lied about the terms of the plea bargain agreement telling Plaintiff one thing and having him agree to another after the fact. Plaintiff did not know the full terms until after he was discharged and was given a copy of the actual deal, which was different from the terms Plaintiff and Defendant Hall discussed.

350.)    The plea deal contradicts ACS/CPS and Police reports which clearly shows that the allegations in the plea deal are not possible.

351.)    Plaintiff questions that If Defendant Hall had this discovery, why did she not show it to her client. And if she did not have it why did she not file motions to receive it?

352.)    This ineffective counsel lead to a guilty plea from a Father who was simply trying to save his children from the foster care system and an unnecessary adoption process that would have proceeded if Plaintiff did not gain contact with his children within 12 months.

353.)    This deal also violates Plaintiffs constitutional right to travel which Plaintiff never waived knowingly.

354.)    Defendant halls actions fell below an objective standard of reasonableness and given the lack of evidence and exonerating information retrieved by plaintiff on his own and after the fact gives a reasonable probability that plaintiff would have been released/exonerated if Defendant Hall had only performed adequately. See: **Strickland v. Washington, 466 U.S. 668 (1984)**

**TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

355.)    Plaintiff was injured as a result of defendant Halls' ineffective counsel

356.)    Plaintiff is entitled to a retrial to prove his innocence with new evidence and a

chance to be tried fairly.

## COUNT XIV - (NEGLIGENT HIRING & RETENTION)

## (THE CITY OF NEW YORK & COUNTY)

Plaintiff incorporates the preceding paragraphs by reference herein.

357.)    Defendant City, through the NYPD and ACS, owed a duty of care to plaintiff to

prevent the loss of liberty and mental abuse sustained by plaintiff.

358.)    Defendant City, through the NYPD and ACS, owed a duty of care to plaintiff

because under the same or similar circumstances a reasonable, prudent and careful person

should have anticipated an injury to plaintiff or those in a position similar to plaintiff's as a

result of this conduct.

359.)    Upon information and belief, defendant officers were incompetent and unfit for their

positions.

360.)    Upon information and belief, defendant City knew or should have known through

exercise of reasonable diligence that the officer defendants were potentially dangerous and

had previously falsely arrested civilians without probable cause.

361.)    Upon information and belief, defendant City knew or should have known through

exercise of reasonable diligence that the ACS defendants were potentially dangerous and

had previously falsely accused parents of neglect and abuse without probable cause.

362.)    Defendant City's negligence in hiring and retaining the officer defendants

proximately caused plaintiff's injuries.

363.)    Because of the defendant City's negligent hiring and retention of defendant officers,

plaintiff incurred damages described above.

## COUNT XV - (RESPONDEAT SUPERIOR)

Plaintiff incorporates the preceding paragraphs by reference herein.

364.)        Defendants' intentional tortious acts were undertaken within the scope of their

employment by defendant City of New York and in furtherance of the defendant City of

New York's interest.

365.)        As a result of defendants' tortious conduct in the course of their employment and in

furtherance of the business of defendant City of New York, Plaintiff was damaged.

## COUNT XVI - (CONSPIRACY) RE: False Diagnoses
## (NYC+HEALTH METROPOLITAN HOSPITAL)

Plaintiff incorporates the preceding paragraphs by reference herein.

366.)        Defendants agreed to violate the plaintiffs' rights in the manner described above.

Further defendants made an agreement to attempt to deprive Plaintiff of his right to assign

his Children to his Mother and Sister by interfering with the background process of ACS for

foster parents. Indicating that Plaintiffs family had mental illnesses when it was in fact not

true shows that the City Defendant attempted to attack Plaintiff through one of its creatures.

367.)        Defendants took action in furtherance of this agreement by refusing to amend

Plaintiffs medical report and removing his Mother and Sisters record from his.

368.)        Plaintiff believes that these actions were part of a conspiracy to retaliate against the

for filing a Notice of Claim against The City of New York.

369.)        Plaintiff was injured as a result of defendants' conspiracy.

TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York

## COUNT XVII – DEPREVATION OF VISTIATION
## (THE NEW YORK FOUNDLING)

370.)    Defendants have deprived plaintiff of his civil, constitutional and statutory rights

under color of law and have conspired to deprive him of such rights and are liable to

plaintiff under 42 USC § 1983.

371.)    Defendants' conduct deprived plaintiff of his right to receive visits with his children,

pursuant to New York state law, procedures, and the constitution.

372.)    At all times relevant Plaintiffs Children were in the care custody and supervision of

Defendant.

373.)    Defendant is responsible for the management of child / parent interaction for the

purpose of visitation.

374.)    Defendant admitted in Family Court that it made no attempt to grant Plaintiff

visitation.

375.)    Because Defendant didn't arrange visits, Plaintiff suffered damages.

376.)    Defendants' acted willfully, knowingly and purposefully and/or with deliberate

indifference to deprive Plaintiff of his Constitutional and Rights as a parent. As a result of

the nature of Defendant's conduct, and breach of duty, Plaintiff is entitled to recover general

& punitive damages against The New York Foundling.

### JURY DEMAND

Plaintiff hereby demands trial by jury.

### REQUEST FOR RELIEF

Plaintiff incorporates the preceding paragraphs by reference herein.

TITLE **42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York**

WHEREFORE, Plaintiff seeks the following relief:

**I.** Actual and compensatory damages sufficient to make him whole.

**II.** Punitive damages against Defendants sufficient to punish them and to deter further

wrongdoing;

**III.** Treble damages;

**IV.** Injunctive relief sufficient to protect Plaintiff and his family from the ongoing harassment

and intimidation of Defendants.

**V.** Attorneys' fees, litigation expenses, costs, pre- and post-judgment interest as provided by

law; and

**VI.** Such other and further relief as the Court deems just and proper

DATED: February 6, 2020

JOHN GUERRIER DE'BEY
In Pro Se

TO:
New York City
Corporation Counsel Office
100 Church Street, 4th floor
New York, NY 10007

Schiavetti Corgan Di Edwards.
Attorney for The City of New York
Attn: Edward R. Nicholson Esq.
575 8th Ave #14,
New York, NY 10018

Mubanga Nsofu - Shield #7263911 UNIT #497-6
C/O Administration for Children's Services
150 William Street,
New York, NY 10038

Marsha Weaks - Shield # UNKNOWN
C/O Administration for Children's Services
150 William Street,
New York, NY 10038

PO Stephanie Eiel - Shield #1875
NYPD
100 Police Plaza
New York, NY 10007

PO Castellanos - Shield #24327
NYPD
100 Police Plaza

TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York

1  New York NY 10007

2  Caitlyn Hall
   County Defenders Services
3  100 William St,
   New York, NY 10038

4
   Elsa Gaston
5  74 W 92nd St # 3A
   New York, NY 10025
6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

TITLE 42 U.S.C. § 1983, & § 1985. De'Bey V The City of New York

# EXHIBIT A
Page 1. VICTIMS



# EXHIBIT A

Page 2.

